UNITED STATES of America, Appellee,

v.

Stephen B. ZACKSON and Henry
Acierno, Defendants,

Peter LaGatta, Defendant–Appellant.

No. 401, Docket 93–1314.

United States Court of Appeals,
Second Circuit.

Argued Oct. 22, 1993.

Decided Dec. 21, 1993.

Paul J. McAllister, New York City, for defendant-appellant.

Geoffrey S. Mearns, Asst. U.S. Atty., E.D.N.Y. (Zachary W. Carter, U.S. Atty., Peter A. Norling, Asst. U.S. Atty., of counsel), for appellee.

Before: McLAUGHLIN, JACOBS and REAVLEY,* Circuit Judges.

McLAUGHLIN, Circuit Judge:

Defendant Peter LaGatta appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Raymond J. Dearie, *Judge*). LaGatta had been indicted for two drug conspiracies, the first involving marijuana, the

---

second, cocaine. Judge Dearie granted a severance motion and ordered two consecutive jury trials.

In the first, the jury found LaGatta guilty of conspiracy to distribute and possess with intent to distribute marijuana. A second jury later convicted LaGatta of conspiracy to distribute and possess with intent to distribute cocaine, and acquitted him of possession of cocaine. LaGatta was sentenced to 232 months' imprisonment, to be followed by a five-year term of supervised release, and a $100 special assessment.

In this appeal, LaGatta challenges only his conviction for the cocaine conspiracy. He argues that the district court should not have admitted evidence of the marijuana conspiracy in the cocaine trial, and that the prosecutor improperly commented on that marijuana conspiracy in the cocaine summation. LaGatta also contends that the district court abused its discretion when it permitted the government to call his co-conspirator, Stephen Zackson (who had earlier been convicted of both the marijuana and cocaine conspiracies in a separate trial). LaGatta asserts that the government did this in full knowledge that Zackson would deny all recollection of the disputed events, and under the guise of refreshing his recollection, the government would then put before the jury all of Zackson's prior statements implicating LaGatta.

We conclude (1) that the evidence of LaGatta's prior marijuana conspiracy was properly admitted in the cocaine trial, and (2) that the prosecutor's summation, though borderline, did not deny LaGatta a fair trial. (3) Although we agree with LaGatta that the government should not have been permitted to call Zackson under these circumstances, we conclude that the error here was harmless. Accordingly, and with considerable reluctance, we affirm.

## BACKGROUND

The facts underlying LaGatta's crimes are set forth in this Court's opinion in Zackson's appeal. *See United States v. Zackson*, 6

---

* The Honorable Thomas M. Reavley, of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

**1180**

F.3d 911, 914–17 (2d Cir.1993). We assume some familiarity with them, and add only those facts necessary to decide LaGatta's appeal.

## A. *LaGatta's Crimes*

In March 1989, LaGatta and Zackson were arrested in Westchester County for participating in a conspiracy to transport bales of marijuana from Texas to New York. To avoid prosecution, the two separately agreed to cooperate with the government. For his part, LaGatta agreed to assist the Drug Enforcement Agency ("DEA") in its efforts to locate an individual suspected of murdering a DEA agent. In exchange, the government promised not to prosecute LaGatta for his role in the marijuana conspiracy, provided that he did not commit any more crimes. Unfortunately, LaGatta did not keep his end of the bargain.

A year later, a cocaine dealer named "Julian" consigned five kilograms of cocaine to Zackson for sale. Julian's agent, Alexander Guzman–Tabora, delivered the cocaine to Zackson, who promised to pay $150,000 within a few weeks. When Zackson failed to pay, Julian sent Guzman–Tabora to pressure him. Both Zackson and LaGatta met repeatedly with Guzman–Tabora and Julian to negotiate a solution to Zackson's debt problem. These negotiations proved unsuccessful.

Frustrated and impatient, Julian ordered Guzman–Tabora to kidnap Zackson. When Guzman–Tabora and his henchmen were unable to find Zackson, Julian settled upon LaGatta. They kidnapped him instead, demanding $200,000 from Zackson to ransom LaGatta. After contacting his attorney, Zackson turned to the FBI for help. The FBI rescued LaGatta in a dramatic shoot out, and promptly arrested Zackson, LaGatta and the kidnappers.

In January 1991, a grand jury returned a three-count indictment against LaGatta and Zackson. The first count resurrected the marijuana-related charges that the government had dropped in exchange for the defendants' cooperation. The second and third

counts related to Zackson's transaction with Julian, and charged the defendants with conspiracy and possession of cocaine. The district court first granted Zackson's motion to sever his trial from LaGatta's, and then granted LaGatta's motion to sever his marijuana trial (Count One) from his cocaine trial (Counts Two and Three). After a two-day trial, a jury convicted LaGatta of the marijuana conspiracy.

## B. *The Cocaine Trial*

LaGatta's trial on the cocaine counts followed shortly thereafter. Over LaGatta's objection, Judge Dearie permitted the government to introduce in its case-in-chief evidence of LaGatta's involvement with Zackson in the marijuana conspiracy. Judge Dearie ruled that this evidence was relevant to prove LaGatta's intent to conspire with Zackson, and to help explain to the jury the relationship between Zackson and LaGatta.

The government also called Guzman–Tabora, who testified that he met with LaGatta and Zackson repeatedly to discuss payment for the cocaine delivered to Zackson. Guzman–Tabora further testified that both he and Julian considered LaGatta to be Zackson's partner in the cocaine transaction. Accordingly, Guzman–Tabora testified, it was a matter of indifference to Julian whether he kidnapped Zackson or LaGatta.

Finally, the government called Zackson to testify as a hostile witness. Before Zackson testified, the government examined him twice outside the presence of the jury. The first attempt ended before it began, as Zackson appeared to suffer a mysterious seizure on the witness stand and had to be removed from the courtroom. Zackson's attorney explained to Judge Dearie that Zackson had suffered brain damage in a car accident several years earlier, and now suffered episodic grand mal seizures.[1]

The second time he appeared in court, Zackson was listless and unhelpful, and denied any recollection of the disputed events. His memory lapses, however, were selective.

---

1. We express no opinion on whether Zackson's seizure and subsequent memory lapses were the genuine consequence of brain injury, or, as the government suspected, a cynical fabrication. Judge Dearie, who was there, characterized Zackson's seizure as a "complete charade."

For example, he remembered who LaGatta was, and that LaGatta had been kidnapped; however, he provided few new details of the kidnapping. In repeated attempts to refresh Zackson's recollection, the government confronted Zackson with statements Zackson had made to FBI agents at the time of the kidnapping. Zackson steadfastly denied that his memory was refreshed.

Following this *voir dire*, LaGatta's counsel sought to bar Zackson from testifying, arguing that he would be unable to cross-examine him effectively. In response, the government acknowledged that it did not expect Zackson to give relevant testimony:

> Your honor, I think even if I don't get any truthful testimony, and it appears that that's what I am about to get, I think the interests of the prosecution will actually be served by having this witness stand up here and say under oath that he remembers nothing about this, and I will confront him with some things to refresh his recollection, and I frankly think that that will only help us.

Thus, the government all but conceded that its only purpose in calling Zackson was to get his prior statements before the jury under the rubric of "refreshing recollection." Nevertheless, Judge Dearie overruled LaGatta's objection, concluding that Zackson could testify to *some* details of the kidnapping, and to his relationship to LaGatta. Recognizing that Zackson's statements to the FBI could unfairly prejudice LaGatta, however, Judge Dearie sought to impose a measure of damage control by instructing the government not to read from the FBI reports when questioning Zackson.

In front of the jury, Zackson performed as expected. He denied any recollection of the disputed events, and offered no new details of the conspiracy. When the prosecutor attempted to refresh Zackson's recollection with his prior statements, the following exchanges occurred:

Q: Isn't it a fact that you told the agents that Peter LaGatta had been kidnapped because he had received five kilograms of cocaine but had failed to pay for those five kilograms of cocaine? Isn't that what you told the agents that day?

A: I don't remember.

    *     *     *     *     *     *

Q: [Handed a document] Does that refresh your recollection that you told FBI agents that Peter LaGatta had been kidnapped because he had received five kilograms of cocaine from Colombians and hadn't paid for it?

A: I don't remember that.

    *     *     *     *     *     *

Q: Do you recall telling the agents during that interview that you knew about Peter LaGatta's drug trafficking from statements Peter LaGatta had made to you in the summer of 1990? Do you recall saying that to the agents?

A: No.

    *     *     *     *     *     *

Q: [Handed a document] After having read that, does that refresh your recollection that you told the agents that you knew about this cocaine deal because Peter LaGatta had told you he had received the five kilograms of cocaine in the summer of 1990 from the Colombians?

A: No.

    *     *     *     *     *     *

Q: [Handed a document] Does that refresh your recollection now that when you met with the agents on the day that you reported the kidnapping ... you specifically stated that Mr. LaGatta was the only one involved in this cocaine transaction?

A: I didn't—I wouldn't—I wouldn't have lied, but I don't remember specifically. I don't remember.

    *     *     *     *     *     *

Q: Do you remember telling Mr. Washor, your lawyer, that it was Pete LaGatta alone who was involved in the cocaine deal?

A: It was a fog.

    *     *     *     *     *     *

Q: [Handed a document] Does that refresh your recollection that you told Mr.

Washor that it was Pete LaGatta alone involved in the cocaine deal?

A: I don't remember exactly.

Q: You don't—that doesn't help you? Your sworn affidavit?

A: I don't remember at this moment.

\* \* \* \* \* \*

Q: [I]sn't it a fact that ... when you reported the kidnapping, you told the agents that you had introduced Pete La-Gatta to Julian; isn't that what you told the agents?

A: I don't remember.

\* \* \* \* \* \*

Q: Does this refresh your recollection having read that paragraph that you told the agents that you were aware from Peter LaGatta that LaGatta had arranged to purchase five kilos of cocaine from Julian during the summer of 1990; does that paragraph refresh your recollection?

A: No, it doesn't.

When Zackson completed his testimony, the government sought to call two FBI agents to the stand to impeach Zackson's testimony with the statements he had made to the agents at the time of the kidnapping. Judge Dearie denied the government's request.

LaGatta testified in his own defense. He acknowledged that he knew all along that Zackson was trafficking in cocaine for Julian, and that Zackson owed Julian money for a shipment of cocaine. In addition, LaGatta conceded that he met with Julian and Guzman–Tabora several times to help Zackson negotiate his outstanding debt. LaGatta denied, however, having any stake in Zackson's cocaine transaction. He insisted that he and Zackson were partners only in LaGatta's legitimate trucking business, not in Zackson's illicit cocaine trade.

The jury convicted LaGatta of the conspiracy to possess and distribute cocaine, but acquitted him of the possession of cocaine. This appeal followed.

## DISCUSSION

### I. Rule 404(b) Evidence

LaGatta's primary argument on appeal is that the district court abused its discretion when it allowed the government to introduce evidence of LaGatta's involvement with Zackson in the prior marijuana conspiracy. LaGatta maintains that his intent was never a disputed issue in the case because he denied participating in the cocaine transaction. See, e.g., United States v. Colon, 880 F.2d 650, 656 (2d Cir.1989) ("[I]n some circumstances, the nature of a defense put forth by the defendant may reveal that '[k]nowledge and intent, while technically at issue, [are] not really in dispute.'") (quoting United States v. Benedetto, 571 F.2d 1246, 1249 (2d Cir.1978) (alterations in Colon)). Alternatively, LaGatta argues that the court should not have permitted the government to introduce evidence on intent until after the defense concluded its case. We find neither argument persuasive.

Under Federal Rules of Evidence 403 and 404(b), the government may introduce evidence of a defendant's prior crime if that evidence is relevant for a reason other than to show criminal propensity, and if the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice. See United States v. Gordon, 987 F.2d 902, 908 (2d Cir.1993). Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged. Id. Without doubt, evidence that LaGatta had previously engaged in narcotics trafficking with Zackson is highly probative of LaGatta's intent to enter another drug conspiracy with the same co-conspirator, and to rebut LaGatta's defense of innocent association. See United States v. Ramirez–Amaya, 812 F.2d 813, 817 (2d Cir. 1987) (where defendant denied an intention to involve himself in the unlawful activities of his business associate, "[p]roof that [defendant] had previously sought to engage in precisely such activities was admissible on the issue of his intent").

We are somewhat taken aback by LaGatta's claim that intent was not a disputed issue

at trial. To the contrary, the nature of LaGatta's defense—as outlined by defense counsel in his opening statement and as articulated by LaGatta himself on the stand—demonstrates unequivocally that LaGatta's intent was squarely at issue. In his testimony, LaGatta admitted that he knew about Zackson's cocaine dealing, and acknowledged helping Zackson negotiate with Julian and Guzman–Tabora. The only thing LaGatta denied was that he participated in those discussions with the intent to further the conspiracy. Thus, LaGatta's intent was, realistically, the *only* issue remaining in dispute following his testimony.

■ Nor do we find error in the district court's decision to allow the government to introduce the marijuana evidence in its case-in-chief. *Cf. United States v. Colon,* 880 F.2d 650, 660 (2d Cir.1989) (admission of prior act evidence to prove intent should generally await the conclusion of the defense case); *United States v. Benedetto,* 571 F.2d 1246, 1249 (2d Cir.1978) (same). As explained above, the nature of LaGatta's defense was apparent from the outset of the trial; thus, there was no need to await LaGatta's testimony. *See United States v. Pitre,* 960 F.2d 1112, 1120 (2d Cir.1992); *Colon,* 880 F.2d at 660. Moreover, it seems quite sensible to permit the jury to hear about LaGatta's prior relationship with Zackson earlier rather than later, as such background information might help the jury understand "how the illegal relationship between [the] participants in the crime developed." *Pitre,* 960 F.2d at 1119. *See also United States v. Lasanta,* 978 F.2d 1300, 1307 (2d Cir.1992) ("[o]ur decisions specifically approve the use of evidence of a defendant's prior narcotics dealings to delineate the background details of a conspiracy"). Accordingly, we find no abuse of discretion in the admission of the challenged evidence.

## B. *The Prosecutor's Summation*

LaGatta alternatively argues that even if the evidence of his prior crime was admissible, the prosecutor still committed reversible error by urging the impermissible propensity inference in his summation. We are not persuaded. "The government has broad latitude in the inferences it may reasonably suggest to the jury during summation. However, a prosecutor's statements during summation, if improper, will result in a denial of the defendant's due process rights if the statements cause substantial prejudice to the defendant." *United States v. Casamento,* 887 F.2d 1141, 1189 (2d Cir.1989) (citations omitted), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). *See United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). To determine whether the statements were improper, and whether they caused LaGatta "substantial prejudice," we review the allegedly improper statements in the context of the entire argument. *Id.*

■ No doubt, the prosecutor referred indulgently to the marijuana conspiracy in his summation, and approached the outer frontier of its permissible use. For example, the prosecutor repeatedly described LaGatta as a "drug dealer," and an "experienced drug dealer" when discussing LaGatta's prior crime. Nevertheless, when read in context, we do not understand the prosecutor to have been arguing propensity. Rather, he argued that LaGatta's innocent explanation for his association with Zackson was implausible given their prior illicit relationship.

■ One of the prosecutor's comments especially troubles us. In summation, defense counsel asked the jury to listen carefully to Judge Dearie's charge regarding the permissible and impermissible uses of the marijuana evidence. This is hardly an improper argument. In rebuttal, however, the prosecutor took umbrage and accused defense counsel of engaging in a diversionary tactic: "When [defense counsel] talks about the marijuana arrest, he just wants to talk about the law and what you can use it for and what you can't use it for."

It is difficult to know precisely what the prosecutor's comment meant. It can be read to express his disdain for "talk about the law" and evidentiary rules that limit the permissible uses of certain evidence. To the extent the prosecutor's comment was intended to divert the jury's attention from the judge's instructions on the permissible use of prior act evidence, it was improper. As ex-

plained above, however, what followed that unfortunate comment was not, as LaGatta suggests, an improper propensity argument. Accordingly, we find no substantial prejudice to LaGatta resulting from the prosecutor's summation.

### C. Zackson's Testimony

■ Finally, LaGatta argues that Judge Dearie should not have permitted the government to call Zackson as a witness, given the government's concession that Zackson would not testify to any matter in dispute. We agree, but find the error harmless.

■ While the law generally gives prosecutors broad latitude when questioning hostile and recalcitrant witnesses, that latitude is not unbounded. For example, while the government may now impeach its own witnesses, see Fed.R.Evid. 607, and there is no impropriety in calling a witness and then arguing to the jury that the witness lied on the stand, see United States v. Eisen, 974 F.2d 246, 262–63 (2d Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1840, 123 L.Ed.2d 467 (1993), it remains well established that "impeachment by prior inconsistent statement may not be permitted where employed as a mere subterfuge to get before the jury evidence not otherwise admissible." United States v. Morlang, 531 F.2d 183, 190 (4th Cir.1975). See, e.g., United States v. DeLillo, 620 F.2d 939, 946 (2d Cir.), cert. denied, 449 U.S. 835, 101 S.Ct. 107, 66 L.Ed.2d 41 (1980); United States v. Peterman, 841 F.2d 1474, 1479 & n. 3 (10th Cir. 1988) (collecting cases), cert. denied, 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 774 (1989).

In our view, the prosecutor's questioning of Zackson went beyond the limits of zealous advocacy. The voir dire of Zackson demonstrated conclusively that Zackson would offer no testimony probative of the conspiracy. It was a virtual certainty, moreover, that nothing the government did would refresh Zackson's recollection. If any doubt remained concerning the government's motive, it was dispelled by the prosecutor's candid admission that Zackson's testimony would help the government regardless of what Zackson said on the stand. Finally, although no objection was lodged at the time, we note that the prosecutor's summation improperly invited the jury to disbelieve Zackson's claims that he did not remember anything, and to believe instead the truth of the prosecutor's questions themselves. We are left with no doubt, therefore, that the government called Zackson solely to get before the jury inadmissible hearsay that implicated LaGatta. The prosecutor's explanation that he was merely attempting to refresh Zackson's recollection was, in our view, wholly unacceptable.[2]

The government seeks to derive comfort from United States v. Eisen, 974 F.2d 246 (2d Cir.1992). There, the Court distinguished the facts of the case before it from the "subterfuge" cases, observing:

> Where the Government has called a witness whose corroborating testimony is instrumental to constructing the Government's case, the Government has the right to question the witness, and to attempt to impeach him, about those aspects of his testimony that conflict with the Government's account of the same events. Here, the testimony of the hostile witness provided affirmative proof that was necessary to construct the Government's case [.]

974 F.2d at 262–63 (emphasis added) (citation omitted). In our case, by contrast, Zackson's testimony was not "instrumental to constructing the Government's case" and provided no "affirmative proof that was necessary to construct the Government's case."

The record contradicts the government's assertion. No sooner had Zackson left the stand than the government attempted to call the agents: "At this time we would seek to recall Detective Tkacz and Agent Dressler to essentially impeach Zackson's testimony; in essence, to introduce things that were inconsistent with his testimony, just for the limited purpose of the jury assessing his credibility here today." Tr. at 360. The trial judge wisely refused to allow it.

---

2. At oral argument, the government denied calling Zackson with an improper motive. As evidence of its good intentions, the government offered the following: "In fact, the record shows that [the government] did not then subsequently call other witnesses, that is, the agents to whom the statements were made, and attempt to introduce those statements as prior inconsistent statements of Zackson."

We find the facts of this case more closely akin to those of *United States v. Shoupe*, 548 F.2d 636 (6th Cir.1977). There, in response to a witness's professed lack of memory, the prosecutor repeatedly confronted that witness with his previous statements to the FBI implicating the defendants. The Sixth Circuit found that it was an abuse of discretion to "[permit] the prosecutor, in the presence of the jury, to recite to a recalcitrant Government witness a litany of leading questions" inculpating the defendants. *Id.* at 638.

We recognize, of course, that "the unwilling witness often takes refuge in a failure to remember, and the astute liar is sometimes impregnable unless his flank can be exposed to an attack of this sort." 3A Wigmore, *Evidence* § 1043, at 1061 (Chadbourn rev. 1970). *See, e.g., United States v. Insana*, 423 F.2d 1165, 1170 (2d Cir.), *cert. denied*, 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970). Nevertheless, the decision to permit a witness to testify at all is conditioned upon satisfaction of Rule 403's probative/prejudice balance. Because the government's proffer demonstrated that Zackson would offer no probative testimony, and because the government used Zackson as a mere conduit to get potentially prejudicial hearsay before the jury, we conclude that the testimony should not have been allowed. To hold otherwise would permit the government, under the rubric of refreshing recollection, "to present testimony to the jury by indirection which would not otherwise be admissible." *Morlang*, 531 F.2d at 189.

That said, we must decide whether the error requires reversal. We may affirm a conviction in the face of nonconstitutional error only if we are "sure that the error did not influence the jury, or had but very slight effect." *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). "[W]e are not required to conclude that [the error] could not have had any effect whatever; the error is harmless if we can conclude that [Zackson's] testimony was 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir.1992) (quoting *Yates v. Evatt*, 500 U.S. 391, ——, 111

S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991)). After careful examination of the entire record, we can say "with fair assurance" that the judgment was not "substantially swayed" by Zackson's testimony. *Kotteakos*, 328 U.S. at 765, 66 S.Ct. at 1248.

As a result of the government's tactic, the jury learned that Zackson had told his lawyer and the FBI that LaGatta alone received the shipment of cocaine from Julian in the summer of 1990. The jury learned this solely from the prosecutor's lips, not from Zackson's. Judge Dearie cautioned the jury, both during Zackson's testimony and in the final charge, that the prosecutor's questions were not themselves evidence. Accordingly, "[t]o warrant reversal under these circumstances there must at least be a serious basis for belief that [the] verdict rested on failure by the jury to heed the judge's instructions." *United States v. Cunningham*, 446 F.2d 194, 198 (2d Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266 (1971). We find nothing in this case that would undermine the presumption that the jury followed the instructions it received. *See Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987); *United States v. Castano*, 999 F.2d 615, 618 (2d Cir.1993).

Here, the government's conspiracy case against LaGatta was solid and convincing. *See* Charles A. Wright, *et al., Federal Practice & Procedure: Criminal 2d* § 854, at 305 (1982) ("Perhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant."); *see, e.g., United States v. DeVillio*, 983 F.2d 1185, 1195 (2d Cir.1993) (error harmless "given the overwhelming evidence of guilt" and the "minimal prejudice" to the defendant). Indeed, the evidence that LaGatta played an active and knowing role in arranging to pay Julian for the cocaine was uncontroverted. Moreover, the sole disputed issue remaining for the jury, *i.e.,* LaGatta's intent, need only have been proven by circumstantial evidence. *See Rea*, 958 F.2d at 1214. Finally, the jury's acquittal of LaGatta on the possession count indicates that it did not wholly accept the version of events presented while Zackson was on the witness stand.

In sum, "[t]he testimony for which the government overzealously sought admission could have had 'but very slight effect' on the jury." *United States v. Crouch*, 731 F.2d 621, 624 (9th Cir.1984) (quoting *Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. at 1247–48), *cert. denied*, 469 U.S. 1105, 105 S.Ct. 778, 83 L.Ed.2d 773 (1985). Accordingly, the error was harmless.

## CONCLUSION

We have considered LaGatta's remaining arguments and find them to be without merit. The judgment of conviction is affirmed.